UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE
00
Case No. 99-6091-CR-FERGUSON
Magistrate Judge Snow

UNITED STATES OF AMERICA )
)
)
)
v. )
)
)
TRICIA DICKSON, )
)
      Defendant. )
_____ )



## GOVERNMENT'S RESPONSE TO THE STANDING DISCOVERY ORDER

The United States hereby files this response to the Standing Discovery Order. This response also complies with Local Rule 88.10 and Federal Rule of Criminal Procedure 16, and is numbered to correspond with Local Rule 88.10.

    A.    1.    Any written statements made by the defendant have been provided to counsel for defendant on January 19, 2000.

            2.    Copies of statements made by the defendant to individuals known by her to be law enforcement officers have been provided to counsel for the defendant on January 19, 2000.

            3.    The defendant did not testify before the Grand Jury.

            4.    At the current time, the government is not aware

that the defendant has a prior arrest and conviction record. Should that change, the government will immediately provide counsel for the defendant with information regarding the defendant's prior arrests and convictions.

5.    Books, papers, documents, photographs, tangible objects, buildings or places which the government intends to use as evidence at trial to prove its case in chief, or were obtained or belonging to the defendant may be inspected at a mutually convenient time at the Office of the United States Attorney, 500 E. Broward Blvd., Suite 700, Fort Lauderdale, Florida 33394. The undersigned has temporarily scheduled the discovery conference for May 9, 2000, at 11:00 a.m. Should counsel for the defendant wish to keep this appointment, he should call to confirm the appointment at least forty-eight (48) hours in advance. If this date and time are not convenient for the defendant's counsel, he may contact the undersigned to schedule a mutually convenient time.

6.    No physical or mental examinations or scientific tests or experiments have made in connection with this case at this time.

B.    DEMAND FOR RECIPROCAL DISCOVERY: The United States requests the disclosure and production of materials enumerated as items 1, 2 and 3 of Section B of the Standing Discovery Order. This request is also made pursuant to Rule 16(b) of the Federal Rules of Criminal Procedure.

C.    The government will disclose any information or material which may be favorable on the issues of guilt or punishment within the scope of Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976).

D.    The government will disclose any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, within the scope of Giglio v. United States, 405 U.S. 150 (1972), or Napue v. Illinois, 360 U.S. 264 (1959).

E.    The government will disclose any prior convictions of any alleged co-conspirator, accomplice or informant who will testify for the government at

2

trial.

F.  The defendant was not identified in a lineup, show up, photo spread or similar identification proceedings.

G.  The government has advised its agents and officers involved in this case to preserve all rough notes.

H.  The government will timely advise the defendant of its intent, if any, to introduce during its case in chief proof of evidence pursuant to F.R.E. 404(b). You are hereby on notice that all evidence made available to you for inspection, as well as all statements disclosed herein or in any future discovery letter, may be offered in the trial of this cause, under F.R.E. 404(b) or otherwise (including the inextricably-intertwined doctrine).

I.  The defendant is not an aggrieved person, as defined in Title 18, United States Code, Section 2510(11), of any electronic surveillance.

J.  The government has ordered transcribed the Grand Jury testimony of all witnesses who will testify for the government at the trial of this cause.

K.  The government does not know of any automobile, vessel, or aircraft allegedly used in the commission of this offense that is in the government's possession.

M.  The government is not aware of any latent fingerprints or palm prints which have been identified by a government expert as those of the defendant.

N.  To date, the government has not received a request for disclosure of the subject-matter of expert testimony that the government reasonably expects to offer at trial.

O.  The government will make every possible effort in good faith to stipulate to all facts or points of law the truth and existence of which is not contested and the early resolution of which will expedite trial. These stipulations will be discussed at the discovery conference.

P.  At the discovery conference scheduled in Section A.5, above, the government will seek written

3

stipulations to agreed facts in this case, to be signed by the defendant and defense counsel.

The government is aware of its continuing duty to disclose such newly discovered additional information required by the Standing Discovery Order, Rule 16(c) of the Federal Rules of Criminal Procedure, <u>Brady</u>, <u>Giglio</u>, <u>Napue</u>, and the obligation to assure a fair trial.

In addition to the request made above by the government pursuant to both Section B of the Standing Discovery Order and Rule 16(b) of the Federal Rules of Criminal Procedure, in accordance with Rule 12.1 of the Federal Rules of Criminal Procedure, the government hereby demands Notice of Alibi defense; the approximate parameters of when the offenses occurred are outlined in the indictment.

Documents Bates-numbered 1-120 were previously produced to counsel for the defendant under a cover letter dated January 19, 2000. Documents Bates-numbered 121-141 are attached to the copy of this response provided to counsel for the defendant.

Respectfully submitted,

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: Robin S. Rosenbaum
Assistant U.S. Attorney
Fla. Bar No. 908223
500 E. Broward Blvd.
Suite 700
Fort Lauderdale, FL 33394
Tel: (954)356-7255 ext. 3595
Fax: (954)356-7336

cc: Special Agent Wayne Shields
    Federal Bureau of Investigation

4

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that a true and correct copy of the foregoing was sent by United States mail on April 27th, 2000, to Ron Manto, Esq., 600 Brickell Ave., Suite 200, Miami, Florida 33131.

Robin S. Rosenbaum
Assistant United States Attorney

5

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    2/8/00

     FRED BRIDGEWATER was contacted at his place of business, Park Lake Apartments, 2304 Congress Avenue, Riviera Beach, Florida.  After being advised of the identity of the interviewing agent, BRIDGEWATER furnished the following information:

     He is employed by Lane Company as a Service Manager of Park Lake Apartments.

     A copy of a Cars R Us Sales, Inc. document was displayed to BRIDGEWATER.  On the document was recorded BRIDGEWATER's name and an address of 12501 N.W. 27th Avenue, Miami, Florida, telephone 685-7263.  On the document was also recorded that BRIDGEWATER put a down payment of $1000 on a 1992 Ford Explorer, Serial #C22764 with check #282 drawn on People's Credit Union.  The document is dated 5/19/96 and is signed by FRED BRIDGEWATER.

     BRIDGEWATER advised that he did put $1000 down on the aforementioned Ford Explorer with a check drawn on his account at Peoples Credit Union.  He formerly lived at 12501 N.W. 27th Ave. with a telephone number of 685-7263.  He verified that the signature on the Cars R Us Sales, Inc. document is, in fact, his signature.  The date of 5/19/96 seems to be accurate as to when he put down the $1000 on the Explorer.

     BRIDGEWATER further advised that he did not purchase the Explorer.  Several days after he signed the document, approximately 5/21/96, he returned to Cars R Us Sales, Inc. at their office at 3340 N.W. 36th Street, Miami, Florida.  He believed that the payments would be more than he was comfortable with on the Explorer so he purchased a 1994 Mazda MPV mini-van from Cars R Us Sales, Inc., instead.  The $1000 down payment was transferred from the Explorer to the Mazda.  He is still making payments on the Mazda to Trans South Finance Company.  He will furnish any documentation he has pertaining to the transaction if requested to do so.

---

Investigation on   2/7/00        at   Riviera Beach, Florida

File #   29J-MM-81170 -58                          Date dictated   2/8/00

by   SA Wayne A. Shields
                 WAS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

121

29J-MM-81170

Continuation of FD-302 of ___Fred Bridgewater_____ , On _2/7/00_____ , Page ___2___

      Photographs of TRICIA DICKSON, EUPHEMIA DUNCAN AND NALIO WILLIAMS were separately displayed to BRIDGEWATER. BRIDGEWATER advised that he did not know any of the individuals in the photographs.

      BRIDGEWATER further advised that he was not acquainted with anyone by the names of TRICIA DICKSON, EUPHEMIA DUNCAN or NALIO WILLIAMS.

      BRIDGEWATER advised that he did not help purchase the aforementioned Ford Explorer for DICKSON by putting a $1000 down payment on it.

/22

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____1/21/00_____

      NICOLAS MENDIZEBAL, Cars R Us Sales, Inc. (CRUS), 16901 South Dixie Highway, Miami, Florida, telephone 305/259-9511 was telephonically contacted at his place of business. After being advised of the identity of the interviewing agent, MENDIZEBAL furnished the following information concerning documents he had supplied to the Federal Bureau of Investigation (FBI) by command of a Federal Grand Jury subpoena which pertained to a vehicle purchase by TRICIA DICKSON:

      Referring to the only document in the group of documents he sent to the FBI, that has FRED BRIDGEWATER'S name on it, MENDIZEBAL advised that he could explain the document, said document entitled CARS R US SALES, INC. "WE FINANCE EVERYONE". The files at CRUS are kept by vehicle , not by customer. To fulfill the request of the subpoena he sent the entire file on the 1992 Ford Explorer, vehicle identification number 1FMDU32X4NUC22764, which was purchased by DICKSON.

      In reviewing the file MENDIZEBAL concludes that BRIDGEWATER has no connection to DICKSON. He explains this conclusion by first advising that on the aforementioned document BRIDGEWATER is listed as the purchaser of the 1992 Ford Explorer. The document shows that he made a deposit of $1000 which was at least partially made with check #282, drawn on People's Credit Union. BRIDGEWATER'S signature is on the purchaser line and dated 5/19/96.

      MENDIZEBAL advised that at the bottom of the agreement is a note indicating that if credit is not approved the down payment will be refunded in full. Also at the bottom of the agreement a tabulation is listed which consists of $800 cash and $200 check for a total of $1000. Directly to the right, next to the tabulation is the date 5-23-96. What this information at the bottom of the agreement means is that BRIDGEWATER was refunded the $1000 deposit on 5/23/96 , four days after he had made the deposit. For some reason, which MENDIZEBAL does not recall, BRIDGEWATER did not go through with the purchase.

      MENDIZEBAL further advised that the DICKSON transaction was totally separate from the BRIDGEWATER transaction. All the rest of the documents in the file pertain to DICKSON'S purchase

---

| | | |
|---|---|---|
| Investigation on | _1/21/00_ at N Miami Beach, Florida | (telephonically) |
| File # | 29J-MM-81170 | Date dictated  _1/21/00_ |
| by | SA Wayne A. Shields | *(initials)* ⟶ 29J-MM-81170-5 ) |
| | *Wü√* | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

/23

FD-302a (Rev. 10-6-95)


29J-MM-81170


Continuation of FD-302 of ___Nicolas Mendizebal_____, On _1/21/00___, Page ___2___

of the 1992 Ford Explorer on 5/27/96, and BRIDGEWATER'S name is
on none of them.  The entire file of the 1992 Ford Explorer was
sent to the FBI which included the BRIDGEWATER deal which did not
close and the DICKSON deal which did close.

        MENDIZEBAL advised that according to the file DICKSON
made a $2000 cash deposit on the 1992 Ford Explorer.


124

29J-MM-81170
WAS:was
was

1


     The following investigation was conducted by SA Wayne
A. Shields on January 19, 2000:

     MARIE BEVIS, District Manager, Archon Management
Services (AMS), telephone 954/730-0334 was telephonically
contacted pertaining to FRED BRIDGEWATER. BEVIS advised that
BRIDGEWATER no longer works for AMS. He now is employed by Lane
Company. BEVIS advised to contact ANGIE ISHAM at Lane at
telephone 561/863-5001, cellular 954-309-4926.

     A telephone call to Lane found ISHAM to be out of town.
However, a woman who is ISHAM's assistant confirmed that
BRIDGEWATER currently works for Lane and that she would have him
telephone SA Shields today.

29J-MM-81170
WAS:was
awbd

1

      The following investigation was conducted by SA Wayne A. Shields on January 18, 2000:

      KIMBERLY WELLS, Leasing Consultant, Westview Terrace Rental Apartments (WTRA), 12501 N.W. 27th Avenue, Miami, Florida was contacted at her place of business.  WELLS advised that FRED BRIDGEWATER formerly worked and lived at WTRA.  He was the Maintenance Supervisor and lived in Apartment S-224.  Bridgewater actually worked for Archon Management Services (ACM), which has headquarters in Dallas, Texas.  BRIDGEWATER no longer works at WTRA because ACM no longer performs the maintenance there.  It has been two years since BRIDGEWATER left.  WELLS did not know the whereabouts of BRIDGEWATER, but she believed that ACM had a local office in Fort Lauderdale.

      A business card was left in the door at 20105 N.W. 12th Place, Miami, Florida requesting a telephone call from TRICIA GERALDINE DICKSON.  Parked in the driveway was a dark gray 4 door Mazda 323 bearing Florida license UUV60E.  The vehicle is registered to GARTH A. DICKSON, 20105 N.W. 12th Place, Miami.

      A neighbor ███████████████████████████████████████ confirmed that a woman by the name of DICKSON did live at the residence but she declined to give any more information.  Parked in the driveway at ██████████████████████████████████████

      A telephone call was received from GNEIVA DICKSON who lives at 20105 N.W. 12th Pl.  She advised that she had received the business card and relayed the information to her daughter TRICIA DICKSON.

126

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___1/18/00___

      TRICIA GERALDINE DICKSON telephonically contacted the interviewing agent in response to a business card left in the door at 20105 N.W. 12th Place, Miami, Florida.

      Special Agent (SA) Wayne A. Shields advised DICKSON that he wanted to contact her pertaining to a bank fraud performed on Barnett Bank several years ago, when she worked at Barnett Bank.

      SA Shields asked DICKSON if she had received a letter from Assistant United States Attorney (AUSA) Robin S. Rosenbaum advising that she was a target of a federal investigation. DICKSON responded that she had not.  SA Shields indicated that the letter was sent to the same address where he had left his business card on this day, 20105 N.W. 12th Place, Miami, Florida. SA Shields advised that he would attempt to have a copy of the letter sent to the same address, as DICKSON confirmed that she receives mail at the address, said address being that of her mother.

      SA Shields asked DICKSON if she had an attorney. DICKSON responded that she did not.  SA Shields asked if she wanted an attorney and could she afford an attorney.  DICKSON responded by inquiring if she needed an attorney.  SA Shields advised that he could not advise her on that.  DICKSON asked if there was a warrant for her arrest.  SA Shields advised there was not.  DICKSON responded that she did not see why she would need an attorney.  SA Shields advised that the letter from AUSA Rosenbaum, which she did not receive, indicates that she (DICKSON) is a target of an investigation.

      SA Shields advised DICKSON that if she chose not to retain an attorney that he would want to interview her concerning the bank fraud.

      DICKSON advised that she would talk to her mother and some other individuals about retaining an attorney and contact SA Shields by the end of the week.

      Several minutes later DICKSON telephonically recontacted SA Shields and asked how that she would initiate

---

Investigation on ___1/18/00___ at _Miami, Florida_ ___(telephonically)___

File # _29J-MM-81170_      Date dictated ___1/18/00___

by _SA Wayne A. Shields_      ~~(signature)~~

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

127

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Tricia Geraldine Dickson_____, On _1/18/00_____, Page ___2___

having an attorney appointed for her. SA Shields responded that
he would contact AUSA Rosenbaum to set up a court appearance for
DICKSON where it would be determined if an attoney could be
appointed for her. DICKSON advised that she had not made up her
mind but would be in contact with SA Shields.

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____12/7/99_____

     Received via the United States mail from Janice
Vincell, Subpoena Department, Nationsbank, 9000 Southside
Boulevard, Jacksonville, Florida 32256-0712 were the following
documents:

     1. Copies of the signature card, bank statements and
checks in excess of $500.00 for the time period January 1, 1996
through December 31, 1996, for account 1464602054 in the name of
GNEIVA D. DICKSON or TRICIA DICKSON.

     2. Copies of the opening certificate of deposit number
30000063888548 in the name of GNEIVA D. DICKSON ITF TRICIA
DICKSON, and the purchasing offsets dated January 11, 1996.

     These items were placed in the 1A section of the file.

---

Investigation on __12/2/99__ at __N Miami Beach, Florida__

File # __29J-MM-81170__                                    Date dictated __12/7/99__

by __SA Wayne A. Shields__                                          29J-MM-81110-47
    ~was

/29

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    11/30/99

     EUPHEMIA LAVONTE DUNCAN arrived at the United States
Attorney's Office in Fort Lauderdale, Florida. DUNCAN was
accompanied by her attorney, Daryl Wilcox. Having previously
been advised of the identity of the interviewing agent, DUNCAN
furnished the following information in the presence of Mr.
Wilcox, Assistant United States Attorney Robin Rosenbaum and
Special Agent (SA) Wayne A. Shields:

     She met NALIO WILLIAMS through a friend, TOMICA
TOBRIDGE, who she worked with at Barnett Bank. She and TOBRIDGE
would double date with WILLIAMS and another male individual.
WILLIAMS was TOBRIDGE'S date. DUNCAN was not working at Barnett
Bank at the time of these dates, but had already left the bank
for another job.

     Subsequently, WILLIAMS contacted DUNCAN at her home and
asked her what he would need to do to open a checking account.
She advised that she would put him in touch with TRICIA DICKSON,
a Barnett Bank employee.

     A three way telephone conversation was set up between
DUNCAN, WILLIAMS and DICKSON. DUNCAN recalls that she and
DICKSON were at their separate homes, and WILLIAMS was at another
location. WILLIAMS telephoned DUNCAN and then she connected them
to DICKSON.

     During the telephone conversation WILLIAMS asked
DICKSON what type of documents he needed to open a checking
account. DICKSON replied that he needed two forms of
identification. He also asked DICKSON if she had access to
certain accounts. DICKSON replied that she did have access to
bank accounts. WILLIAMS inferred that he was interested in
business accounts. DICKSON replied that she did have access to
business accounts.

     DUNCAN does not recall WILLIAMS bringing up the law
firm of Kaplan, Jaffe and Gates (KJG). DICKSON first mentioned
this law firm and the fact that big deposits were made into their
account on a daily basis. WILLIAMS and DICKSON discussed how
they could use the information she had access to pertaining to
KJG. DUNCAN heard WILLIAMS say that he could order checks in

---

Investigation on    11/23/99    at Ft Lauderdale, Florida

File #  29J-MM-81170                          Date dictated    11/30/99

by    SA Wayne A. Shields

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

130

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Euphemia Lavonte Duncan___ , On _11/23/99_ , Page ___2___

KJG's name and have them delivered to a house.  During the
telephone call DICKSON and WILLIAMS exchanged telephone numbers.

DUNCAN knows that WILLIAMS did order KJG checks and
received them by Federal Express.

Several days later WILLIAMS visited DUNCAN's house and
asked where DICKSON lived.  DUNCAN proceeded to show WILLIAMS
where DICKSON's residence was by accompanying him in an
automobile to her (DICKSON's) house.  WILLIAMS exited the vehicle
and conversed with DICKSON, who met him outside.  They talked for
about five to ten minutes near the rear of the car while DUNCAN
remained in the automobile.

Subsequently, one day DICKSON telephoned DUNCAN at her
place of business.  DICKSON advised DUNCAN that she and WILLIAMS
had decided on a day that they would cash the KJG checks that
WILLIAMS had received by Federal Express.  DICKSON further
advised DUNCAN that WILLIAMS did not want to cash the checks by
himself.  DICKSON was in agreement with WILLIAMS on this and told
DUNCAN that she would need to accompany WILLIAMS while he cashed
the KJG checks.  DUNCAN initially refused DICKSON's request that
she accompany WILLIAMS.  However, DICKSON threatened DUNCAN and
her child, stating that if she wanted to continue to see her
child that she would participate in the cashing of the KJG
checks.  DUNCAN agreed to accompany WILLIAMS.

During this time period DICKSON made a statement to
DUNCAN that she was dissatisfied with her situation at the bank.
DUNCAN does not know where DICKSON lives now.  She remembers her
residence to be in Norland in the vicinity of N.W. 199th Street
and N.W. 21st or N.W. 23rd Avenue.

DUNCAN advised that in a previous interview with SA
Sergio Guzman, she attempted to mention the threats by DICKSON.
However, SA GUZMAN appeared to be focusing on the counterfeit KJG
checks that had been cashed and her handwriting on the checks.

On the day that WILLIAMS and DUNCAN cashed the KJG
checks, DICKSON telephoned DUNCAN in the morning at her place of
business, Home Medical Supply (HMS), in Hollywood, Florida.  This
telephone call preceded the act of cashing the KJG checks which
took place later in the day.  During the telephone call DICKSON

131

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Euphemia Lavonte Duncan_____ , On _11/23/99___ , Page ___3___

advised that the KJG checks would be cashed that day.  DICKSON
reemphasized to DUNCAN that WILLIAMS did not want to do it by
himself.  Furthermore, DICKSON wanted DUNCAN to accompany
WILLIAMS because she did not know him and did not want to be
cheated.  After this telephone call was completed, DUNCAN
proceeded to approach her supervisor, DAVID Last Name Unknown
(LNU).  She advised DAVID LNU that an emergency had occurred and
that she needed to attend to it.  DAVID gave her permission to
leave work.  HMS keeps attendance information and records
employee's time worked by the use of time cards.  DUNCAN advised
that her time card for the day she and WILLIAMS cashed the checks
will show that she clocked out in the morning.

        DUNCAN advised that this entire scheme was organized by
WILLIAMS and DICKSON.  She did not want to have anything to do
with it.

        After clocking out at HMS, DUNCAN proceeded to her
residence at 4442 N.W. 201st Street, Miami, Florida  33055.  Upon
arriving she observed WILLIAMS waiting outside her residence in
his car.  DUNCAN entered her residence to check on her child.
WILLIAMS knocked on the door of her residence.  She answered his
knock and observed him to be dressed in business attire.  A semi-
automatic pistol, black in color, was tucked in his pants.
DUNCAN asked WILLIAMS what he wanted.  WILLIAMS replied "Don't
play with me."  She informed her grandparents that she had to go
and she proceeded to enter WILLIAMS' car.

        Upon entering WILLIAMS' car DUNCAN noticed a Federal
Express box on the floor.  She opened the box and observed checks
inside.  She pulled out the contents and noticed that the checks
were long business checks.  The checks had three names at the
top.  WILLIAMS instructed her to write on the checks.  He gave
her a piece of identification which was not in the name of
WILLIAMS, but a different name.  He told her to make the check
payable to the name on the identification.  He then told her to
sign a particular lawyer's name on the signature line and to fill
in the amount line with a figure that was over $900.  DUNCAN
cannot remember what the exact amount was, but does know that it
was over $900.  WILLIAMS instructed her to keep filling out the
checks in the aforementioned manner until he told her to stop.

        WILLIAMS and DUNCAN made numerous stops at Barnett Bank

*132*

29J-MM-81170

Continuation of FD-302 of __Euphemia Lavonte Duncan__ , On _11/23/99_ , Page __4__

drive thru teller stations. WILLIAMS endorsed the checks that
DUNCAN had filled out and submitted them to the drive thru
tellers with the fake identification. DUNCAN did not think that
the scheme would work, but was taken aback when the first attempt
to cash one of the counterfeit checks worked with no problem
encountered. The only thing that DUNCAN remembers WILLIAMS
saying to the tellers was "Thank you." At first, WILLIAMS had
his gun placed on the seat between them. However, he moved it to
the glove compartment and made the statement that "Broward don't
play that", meaning that Broward County law enforcement was
strict in their enforcememnt of gun violations.

DUNCAN accompanied WILLIAMS to various Barnett Bank
teller stations until approximately 3:30pm. WILLIAMS took her
home (her grandparent's house) but did not give her any of the
money accumulated through cashing the checks. DUNCAN never had
contact with him again after that.

Several times during their journey to the various
Barnett Bank locations, WILLIAMS received beeps on his beeper.
WILLIAMS made the comment that DICKSON was beeping him.

Some time passed and one day DUNCAN received a
telephone call from DICKSON at her residence. DICKSON advised
that she needed to talk and proceeded to visit DUNCAN. DICKSON
advised that she was being questioned at her place of employment,
Barnett Bank, pertaining to the cashing of the KJG counterfeit
checks. Bank officials were questioning her about how she made
inquiries of the KJG account on the day the checks were cashed.
DICKSON advised that she was scared. DICKSON never mentioned
receiving any money from WILLIAMS, but there was no point where
DUNCAN believed that DICKSON did not receive money. When DICKSON
visited DUNCAN she was driving a new Ford truck. DICKSON had
always wanted a Ford truck. She had previously driven her
mother's Ford Bronco.

DUNCAN was asked why she had told SA Guzman that
neither she nor DICKSON had received any money from WILLIAMS.
DUNCAN advised that she could have misunderstood SA Guzman's
questioning.

DUNCAN advised that during DICKSON's visit she agreed
to honor DICKSON's request of her that she tell no one

_133_

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Euphemia Lavonte Duncan_____ , On _11/23/99_ , Page ___5___

investigating the matter that DICKSON had received money.
DICKSON wanted their stories to match.  Furthermore, DICKSON
wanted DUNCAN to not tell investigators that she supplied
WILLIAMS with KJG's tax identification number.  DICKSON asked
DUNCAN if she had received any money from WILLIAMS.  DUNCAN
replied that she had not.  DICKSON advised DUNCAN that she had
received $4000 from WILLIAMS, but felt cheated.

      DUNCAN advised that she does not know how WILLIAMS came
up with the signatory name of DOUGLAS KAPLAN, which was used on
the counterfeit checks.

      DUNCAN does not know anything about the address of 291
N.W. 177th Street.

      DUNCAN was asked about the fact that during her
interview with SA Guzman, she had stated that WILLIAMS had,
initially, mentioned the KJG law firm to her.  This would be in
opposition to her statement during the present interview that
DICKSON was the one who brought to light the KJG bank account.
DUNCAN advised that what she had stated to SA Guzman is actually
what happened, that being, that WILLIAMS did advise her that a
law firm owed him money and he wanted to obtain information about
it.  Part of the information that he needed was the tax
identification number of the law firm.  DUNCAN advised WILLIAMS
that she knew who could obtain that information for him, thus
pointing him toward DICKSON.

      DUNCAN was referred to her interview with SA Guzman
where she stated that the day after WILLIAMS approached her she
telephoned DICKSON and asked if she could check an account for
her, and DICKSON agreed to do it.  DUNCAN advised that this
statement to SA Guzman is true.

      DUNCAN was referred to her interview with SA Guzman
where she stated that the day after her telephone call with
DICKSON, she and WILLIAMS visited DICKSON at her home.  DUNCAN
advised that this statement to SA Guzman is true.

      DUNCAN was referred to her interview with SA Guzman
where she stated the following:  During the visit to DICKSON's
house WILLIAMS explained to DICKSON what information he wanted to
obtain.  He had some checks from a law firm and wanted to know if

134

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Euphemia Lavonte Duncan___ , On _11/23/99_ , Page ___6___

they had enough funds to cover.  WILLIAMS provided DICKSON with
the law firm's name and tax identification number.  He asked her
to verify the tax identification number and obtain the current
balance amount.  DUNCAN advised the following on the statements
to SA Guzman:  The statements are true with the exception that
she does not remember if WILLIAMS asked DICKSON to verify what
funds KJG had in their bank account.  Furthermore, in addition to
discussing the KJG account, another account was discussed where a
considerable amount of deposits were made and money was
available.  DUNCAN does not recall the name of that account.

        DUNCAN was referred to her interview with SA Guzman.
She was asked what information she told SA Guzman that was
untrue.  DUNCAN advised that the statement to him that DICKSON
did not receive any money from WILLIAMS for her role in the
counterfeit check cashing scheme was a lie.  DICKSON asked her to
confirm what she (DICKSON) had previously told investigators
about receiving no money.

        DUNCAN was referred to her interview with SA Guzman
where she stated that she had attempted to contact WILLIAMS for
approximately one week by calling him on his beeper.  Earlier in
this interview she had advised that she never had contact with
WILLIAMS again after the day he cashed the checks.  DUNCAN
advised that she did, in fact, attempt to beep WILLIAMS after
DICKSON advised that she had been questioned by bank security.
DUNCAN wanted to let WILLIAMS know that DICKSON had been
questioned about the counterfeit checks.  However, DUNCAN could
not reach WILLIAMS.

        DUNCAN was referred to her interview with SA Guzman
where she made a statement, to the effect, that this was the
extent of her involvement.  This statement was made before SA
Guzman had asked any questions about who filled out the KJG
checks which WILLIAMS cashed.  DUNCAN denies making that
statement to SA Guzman.  She advised that SA Guzman did not ask
any questions about the checks before she submitted handwriting
samples to him.  She did not admit to writing the checks until
after she had submitted the handwriting samples.

        DUNCAN was asked if she had anything more to say
concerning the cashing of the KJG checks.  DUNCAN advised that
she has, in fact, been in contact with WILLIAMS.  WILLIAMS

*135*

FD-302a (Rev. 10-6-95)


29J-MM-81170


Continuation of FD-302 of   __Euphemia Lavonte Duncan_____ , On __11/23/99__ , Page __7__

advised her not to tell investigators anything.  He said "Those
crackers don't have anything on me.  Don't tell them anything."

        DUNCAN further advised that she did not disclose to SA
Guzman that WILLIAMS had a gun during the KJG check cashing
scheme because she was worried about possible retaliation from
WILLIAMS.  At the time, DICKSON had already implicated him with
the checks.  She advised that WILLIAMS always carried a gun and
was involved in a shootout when an individual tried to steal his
car.

        A copy of a Biscayne Mirror & Aluminum, Inc. check,
#1356, dated January 10, 1996, made payable to EUTHEMIA DUCAN
(misspelling), in the amount of $5320.89, signed by TONY
WILLIAMS, drawn on Barnett Bank, was displayed to DUNCAN.  She
advised that she recognized the check and submitted an
explanation.

        She met an individual named TORRENCE LNU through her
friend, TOBRIDGE.  TORRENCE lived in Liberty City.  TORRENCE
asked DUNCAN if she had a bank account.  DUNCAN indicated that
she did.  TORRENCE advised her that someone owed him money and he
had a check for the amount owed, but needed a bank account to get
the check cashed.  TORRENCE asked DUNCAN if she would deposit the
check, if he made it payable to her, into her account, then
withdraw the amount of the check out of her account and give it
to him.  TORRENCE advised that he would pay her $200 for doing
him this favor.  DUNCAN agreed to do it.

        TORRENCE and DUNCAN proceeded to a Barnett Bank branch
office in an automobile.  DUNCAN decided to deposit the check
into the account of her sister, ERICA DUNCAN.  ERICA had not had
much activity in her account and EUPHEMIA believed that this
activity could help keep the account open.

        DUNCAN entered the bank, filled out a deposit slip and
gave the teller the check and the deposit slip.  The teller took
a long time before she came back to DUNCAN and advised her that
the account of Biscayne Mirror & Aluminum, Inc. was closed.
TORRENCE left the scene in the automobile so that she was alone
to handle the situation.  TOBRIDGE came to the bank to drive her
from the scene.  They beeped TORRENCE, but he never called back.

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Euphemia Lavonte Duncan_____ , On _11/23/99_ , Page __8__

     DUNCAN advised that she had never been in trouble with the law before the incident with WILLIAMS.

137

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/7/99

EUPHEMIA LAVONTE DUNCAN was contacted at ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After being advised of
the identity of the interviewing agent, Duncan provided the
following information pertaining to a letter she had received
from Assistant United States Attorney (AUSA) Robin Rosenbaum:

She has received the aforementioned letter which
explained that she was a target in a criminal investigation.  She
does not have an attorney.  She cannot afford an attorney.  She
could appear in United States District Court to have an attorney
appointed for her.

SA Wayne A. Shields advised DUNCAN that he would
coordinate a time through AUSA Rosenbaum wherby DUNCAN could make
her initial appaearance.

DUNCAN advised that she works at ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Investigation on  10/6/99  at  Miami, Florida

File #  29J-MM-81170                Date dictated  · 10/7/99

by  SA Wayne A. Shields
        was

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

*138*

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription _____6/9/99_____

        Nalio Almaric Williams was contacted at North Broward
Detention, Conte Facility, 1351 N.W. 27th Avenue, Pompano Beach,
Florida, by Financial Analyst (FA) Adela Echavarria and Special
Agent (SA) Wayne A. Shields, where Mr. Williams was incarcerated.
Williams was advised of the identities of FA Echavarria and SA
Shields.

        Prior to any questioning SA Shields advised Williams as
follows:

        An FBI investigation had brought forth evidence that
Williams participated in a conspiracy to defraud Barnett Bank
(now Nationsbank) of over $15,000 in May of 1996.  The fraud was
perpetrated by Williams with the assistance of Tricia Dickson and
Euphemia Duncan.  Dickson, who worked at Barnett Bank, assisted
Williams in obtaining information about a checking account of the
law firm of Kaplan, Jaffe and Gates, P.A.  With this information
Williams was able to obtain checks in the name of the law firm,
with the correct checking account number of the law firm.  Duncan
filled out the checks for Williams and was present when he
presented them for cash at various Barnett locations.  At one
particular Barnett location the teller advised Williams that she
needed to check something related to the account the check was
drawn on.  Instead of waiting for her return Williams departed,
leaving behind the check and an alias drivers license in the name
of Zarick Demetrius Smith.  Dickson and Duncan have both
confessed to their part in this matter and have implicated
Williams.

        SA Shields displayed a form to Williams entitled Advice
of Rights and proceeded to read Williams his rights.  Williams
advised that he understood his rights.  Williams declined to sign
a Waiver of Rights, but advised that he had no objection to
answering questions.

        Williams furnished the following information:

        He is planning to work with the Broward County
Sheriff's Office (BCSO) in a matter similar to that which SA
Shields described.  He is giving Officer Cooper of BCSO,
telephone 321-5037, information pertaining to criminal activity,

---

Investigation on ___6/8/99___  at _Pompano Beach, Florida_

File # _29J-MM-81170_                     Date dictated ___6/9/99___

        FA Adela Echavarria
by ___SA Wayne A. Shields___                     _29J-MM-81170-21_

                                                        _139_

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of  Nalio Almaric Williams _____ , On 6/8/99 ____ , Page __2__

and individuals he was involved with in the past.  Officer Cooper
is conducting an investigation of the activities of the
individuals that he was involved with.  One of the individuals is
named Chris Last Name Unknown.  Officer Cooper's investigation is
similar to the fraud that SA Shields described, but on a larger
scale, to include drivers licenses, passports and credit cards.

      Williams advised that his attorney is Kevin Raudt,
telephone 349-2205.

      SA Shields displayed to Williams the Kaplan, Jaffe and
Gates checks used to perpetrate the fraud against Barnett, and
the drivers license in the name of Zarick Demetrius Smith which
contained a photograph of the likeness of Williams.  Williams
declined comment on the items.

      Williams advised that he was arrested by BCSO and has
23 charges against him.  He has been incarcerated eight months.
The charges against him are connected to the bank fraud at
Barnett Bank.

      Williams further advised that he would like to
cooperate with the FBI regarding the Barnett fraud but he feels
that he cannot tell us if he did or didn't take part in the fraud
with the other individuals mentioned because he is not sure how
it would affect the charges he has against him now.  He
acknowledged knowing only one of the individuals that confessed
to the crime and implicated him.

      Williams advised that another concern of his is that if
he cooperates with the FBI, will he jeopardize his situation with
Officer Cooper.  He (Williams) is to appear in court on June 17
and he understands that a contract will be prepared for his
upcoming work with BCSO.

      Williams advised that his mother is Jennifer, 

      The following was obtained through observation and
interview:

          Name:   Nalio Almaric Williams
          Sex:    Male

*140*

FD-302a (Rev. 10-6-95)

29J-MM-81170

Continuation of FD-302 of ___Nalio Almaric Williams_____ , On _6/8/99__ , Page __3__

           Race:     Black
           Height:   6'1"
           Weight:   200lbs.

141